IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 3, 2025

## VELENA MARIA RAMIREZ STIERLE v. LAZ RAMIREZ VALLVEY

**Appeal from the Circuit Court for Bradley County**
**No. V-16-328       Michael E. Jenne, Judge**
_____

**No. E2024-00866-COA-R3-CV**
_____

In this post-divorce action, the parents filed cross-petitions to modify the agreed permanent parenting plan concerning their minor child. Following a hearing, the trial court entered an order determining that a material change in circumstance had occurred and that modification of the parenting plan was in the child's best interest. The trial court changed the designation of primary residential parent from mother to father and adopted a new permanent parenting plan, which granted 237 days with the child to the father and 128 days to the mother annually. The mother has appealed. Discerning no reversible error, we affirm. We deny the father's request for an award of attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JEFFREY USMAN, J., joined.

Andrew E. Bateman, Athens, Tennessee, for the appellant, Velena Maria Ramirez Stierle.

Leah E. Smith, Chattanooga, Tennessee, for the appellee, Laz Ramirez Vallvey.

**OPINION**

I. Factual and Procedural Background

The parties, Velena Maria Ramirez Stierle ("Mother") and Laz Ramirez Vallvey ("Father"), were divorced on October 10, 2016, in the Bradley County Circuit Court ("trial court"). The trial court incorporated into the final decree of divorce an agreed permanent parenting plan ("PPP"), which named Mother as the primary residential parent and provided that the parents would each enjoy equal, fifty-fifty co-parenting time with their minor child, G.V. ("the Child"), who was then six years old.

The parties co-parented the Child without court intervention until December 2022, when Mother filed a petition to modify the PPP. Mother alleged in the petition that a material change in circumstance had occurred necessitating modification because Father had moved to Hixson, Tennessee, a location "over an hour away," with his girlfriend. According to Mother, this move rendered Father's daily, after-school parenting time with the Child under the existing parenting plan "impossible." Mother also alleged that modification of the parenting plan was in the Child's best interest. Mother attached to her petition a proposed permanent parenting plan, which designated Mother as primary residential parent and set forth a schedule wherein Mother would receive 280 days and Father would receive 85 days annually with the Child.

On January 17, 2023, Mother sought an *ex parte* order of protection against Father, alleging, *inter alia*, that Father had been abusive toward the Child. The trial court denied the request for an order of protection without conducting a hearing. Mother subsequently filed a second request for an order of protection on January 20, 2023, the subject of which came to be heard before the trial court on January 30, 2023. During that hearing, the trial court heard testimony from the Child and from Lakita Quarles, the Child's counselor who had been retained by Mother. The trial court declined to grant the second motion for order of protection.[1]

Father subsequently filed an answer to Mother's petition to modify the PPP and concomitantly filed a counter-petition in which Father alleged that Mother had used "derogatory language" toward Father in the presence of the Child, had "blocked" Father from learning about the Child's school information, had "allowed the child to stay out of school an excessive amount," and had raised unfounded accusations of child abuse against Father for "disciplining" the Child. Father attached to his petition a proposed permanent parenting plan naming himself as the primary residential parent and allotting 280 days to Father and 85 days to Mother with the Child annually.

On May 19, 2023, Mother filed a motion for an emergency hearing to suspend Father's co-parenting time.[2] In the motion, Mother alleged that Ms. Quarles had "recommended that Father's time [with the Child] be suspended" or limited. Mother further averred that allowing Father to continue exercising co-parenting time with the Child would be "placing the [C]hild in danger of sustaining irreparable emotional harm." Father denied the allegations in Mother's motion to suspend his parenting time and concomitantly filed a motion for appointment of a "neutral" counselor for the Child. In his motion for a neutral counselor, Father referenced the two separate orders of protection that Mother had sought against Father in January 2023 and recounted that the trial court had "summarily

---

[1] The motions for orders of protection and the transcript from the January 30, 2023 hearing are not in the record.

[2] Mother also filed a "Motion for Birthday Co-Parenting Time" on this date, the contents of which are not relevant to this appeal.

dismissed" the petitions after the Child testified that he was "not afraid of Father" and that Father had not abused him. Father further proffered in the motion his belief that Mother had been attempting to alienate the Child from him.

On June 1, 2023, the trial court conducted a hearing relative to Mother's motion for emergency hearing to suspend Father's co-parenting time and Father's motion for a neutral counselor, during which the court heard testimony from the parents and from Ms. Quarles. The court denied Mother's motion to suspend Father's co-parenting time and granted Father's request for an independent counselor. The court further determined that the Child should continue to attend counseling with Ms. Quarles "to address the multiple issues" confronting the Child. The trial court memorialized these findings in an order entered on June 9, 2023.[3]

On November 7, 2023, the trial court conducted a hearing respecting the cross-petitions to modify the PPP, during which the court considered testimony from both parents and from Ashley Sharp, the "neutral" counselor who had been hired by Father. On December 13, 2023, the trial court delivered its ruling on the petitions from the bench, which the court subsequently summarized and memorialized in an order entered on January 7, 2024.[4]

The trial court initially found that a material change in circumstance had occurred warranting modification of the PPP. The trial court then considered the best interest factors enumerated in Tennessee Code Annotated § 36-6-106(a) and determined that modification of the PPP was in the Child's best interest. The trial court accordingly adopted a modified permanent parenting plan ("modified PPP"), which was attached as an exhibit and incorporated into the final order. The modified PPP, *inter alia*, (1) named Father as the primary residential parent, (2) directed that the Child would attend school in Father's school zone of Hixson, Tennessee, and (3) granted Mother 128 days and Father 237 days annually with the Child. The trial court also determined that Father would pay to Mother child support in the amount of $49.00 per month, attaching a child support worksheet to the final order.

Mother filed a motion to alter or amend and/or reopen proof, which the trial court denied by written order entered on May 20, 2024. The trial court awarded to Father his

---

[3] The trial court expressly incorporated its written findings from the June 9, 2023 order into the final order modifying the PPP.

[4] A transcript from the December 13, 2023 ruling was attached to the final January 7, 2024 order. However, the trial court did not expressly incorporate the transcript by reference into the final order; therefore, we confine our review to the written order. *See, e.g.*, *Shelby v. Shelby*, 696 S.W.3d 360, 361 (Tenn. Ct. App. 1985) ("We do not review the Court's oral statements, unless incorporated in a decree, but review the Court's order and judgments for that is how a Court speaks."); *Sparkle Laundry & Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979) ("[N]o oral pronouncement is of any effect unless and until made a part of a written judgment duly entered.").

reasonable attorney's fees and costs associated with Mother's motion to alter or amend in the amount of $4,333.50. Mother timely appealed.

## II. Issues Presented

Mother presents the following issue for this Court's review, which we have restated slightly:

1.      Whether the trial court abused its discretion by designating Father as the primary residential parent and reducing Mother's co-parenting time, thereby failing to maximize Mother's co-parenting time with the Child.

Father has presented the following additional issue:

2.      Whether Father should be awarded his attorney's fees and costs on appeal pursuant to Tennessee Code Annotated § 36-5-103(c).

## III. Standard of Review

Regarding the proper standard of review in a case involving modification of a permanent parenting plan, our Supreme Court has explained:

> In this non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Kendrick*, 90 S.W.3d at 569. Statutory interpretation is a question of law, which we review de novo. *Mills v. Fulmarque*, 360 S.W.3d 362, 366 (Tenn. 2012).
>
> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. *See In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *See* Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d [714,] 732 [(Tenn. 2005)]; *Kendrick*, 90 S.W.3d at 570; *Hass*, 676 S.W.2d at 555.
>
> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v.*

- 4 -

*Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

\* \* \*

Once a permanent parenting plan has been incorporated in a final divorce decree, the parties are required to comply with it unless and until it is modified as permitted by law. *See* Tenn. Code Ann. § 36-6-405 (2010). In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the "best interest" factors of section 36-6-106(a). *Id.* § 36-6-101(a)(2)(B)-(C) (2010), -106(a) (2010 & Supp. 2013); *see also Kendrick*, 90 S.W.3d at 570; *Boyer* [*v. Heimermann*], 238 S.W.3d [249,] 255 [(Tenn. Ct. App. 2007)].

*Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93, 697-98 (Tenn. 2013). Additionally, "[w]e defer to the trial court's determinations of witness credibility because the trial judge could observe the witnesses' demeanor and hear in-court testimony." *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018).

## IV. Modification of the PPP

Mother argues that the trial court abused its discretion when it modified the PPP by both reducing her co-parenting time with the Child and by designating Father as the primary residential parent. To modify an existing custody arrangement or residential

parenting schedule, the trial court must first determine whether a material change in circumstance has occurred. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). As this Court has previously explained:

> A determination of whether a material change in circumstances has occurred depends on whether a parent is seeking to modify custody or to modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). In particular, modification of custody requires a higher threshold than that required for modification of a residential schedule. *Hawk v. Hawk*, No. E2015-0133-COA-R3-CV, 2016 WL 901518, at *9 (Tenn. Ct. App. Mar. 9, 2016). The section of the statute applicable [in a case involving a potential change in custody] provides that:
>
> > If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> Tenn. Code Ann. § 36-6-101(a)(2)(B)(i). Not every change in circumstances constitutes a material change. Rather, "'[t]he change must be significant before it will be considered material.'" *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015) (quoting *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). There is no bright-line test for courts to use when determining whether a material change in circumstances has occurred. *McClain v. McClain*, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017). But, courts consider the following principles in making this determination:
>
> > "First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way."

*Canzoneri v. Burns*, No. M2020-01109-COA-R3-CV, 2021 WL 3399860, at
*6 (Tenn. Ct. App. Aug. 4, 2021) (quoting *McClain*, 539 S.W.3d at 188)
(citation omitted).

*Paden v. Davison*, No. M2023-00240-COA-R3-JV, 2024 WL 3159510, at *4-5 (Tenn. Ct.
App. June 25, 2024).

After setting forth its factual findings in the final order, the trial court determined
that a material change in circumstance had occurred since the entry of the initial PPP that
warranted modification of the PPP. The trial court provided the following delineation:

> Since the entry of the Final Decree of Divorce and Permanent
> Parenting Plan, there has been a material change in circumstances including:
>
> Mother has moved 3 times since 2021;
>
> The minor child is in his third school since 2021;
>
> The minor child has developed an addiction to video games that is
> problematic;
>
> Mother has remarried;
>
> Father is engaged and resides in Hixson, Tennessee;
>
> Mother is no longer employed;
>
> The current Parenting Plan is not working due to the distance between
> the parties;
>
> The minor child is missing school consistently;
>
> Mother and minor child have developed a co-dependent relationship;
>
> The minor child is now school age; and
>
> There is conflict between the minor child and Stepfather.
>
> Based upon this material change in circumstances, the Permanent
> Parenting Plan needs to be modified to fit the best interest of the minor child.

(Paragraph numbering omitted.) Neither party takes issue on appeal with the trial court's
determination that a material change in circumstance warranting modification of the PPP
was proven in this matter, and we determine that the evidence preponderates in favor of

- 7 -

the trial court's findings in this regard. Therefore, our inquiry focuses upon consideration of whether a modification of the custody arrangement is in the Child's best interest.

Once a trial court finds that a material change in circumstance has occurred, the court must proceed to determine whether modification of the current designation of primary residential parent or co-parenting schedule is in the child's best interest. *See McClain v. McClain*, 539 S.W.3d 170, 189-190 (Tenn. Ct. App. 2017); *Paden*, 2024 WL 3159510, at *5. In the instant case, the trial court modified both the designation of primary residential parent (from Mother to Father) and the co-parenting schedule.

Mother asserts that the trial court "incorrectly weighed and applied the relevant best interest factors" outlined in Tennessee Code Annotated § 36-6-106(a). The version of Tennessee Code Annotated § 36-6-106(a) (West March 18, 2022, to April 22, 2024) in effect at the time the parents filed their countervailing petitions to modify the PPP provided the following regarding the Child's best interest:

> (a)     In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> > (1)     The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> >
> > (2)     Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court

ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)     Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)     The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)     The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)     The love, affection, and emotional ties existing between each parent and the child;

(7)     The emotional needs and developmental level of the child;

(8)     The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.  The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3).  The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9)     The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

- 9 -

(10)     The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11)     Evidence of physical or emotional abuse to the child, to the other parent or to any other person.  The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12)     The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13)     The reasonable preference of the child if twelve (12) years of age or older.  The court may hear the preference of a younger child upon request.  The preference of older children should normally be given greater weight than those of younger children;

(14)     Each parent's employment schedule, and the court may make accommodations consistent with those schedules;

(15)     Any other factors deemed relevant by the court; and

(16)     Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more.

Concerning the best interest analysis, this Court has previously explained:

"Whether modification of a parenting plan serves a child's best interests [is a] factual question[]." *Armbrister*, 414 S.W.3d at 692.  "The pertinent factors to be considered in the best interest analysis are set forth in Tennessee Code Annotated section 36-6-106." *C.W.H.* [*v. L.A.S.*], 538 S.W.3d [488] at 497 [(Tenn. 2017)].  As this Court has explained, "[a]scertaining a child's best interests does not call for a rote examination" of each of the factors "and then a determination of whether the sum of the factors tips in favor or against [one] parent." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).  Furthermore, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

*In re Jonathan S.*, No. M2021-00370-COA-R3-JV, 2022 WL 3695066, at *9 (Tenn. Ct. App. Aug. 26, 2022).  With these principles in mind, we will review the trial court's consideration of the best interest factors.

- 10 -

The trial court examined each factor, except the final one concerning child support, and found that nine of the fifteen factors—factors 1, 2, 3, 4, 6, 7, 8, 9, and 11—weighed in favor of Father. The court determined that factors (5) and (10) favored both parents equally; factors (12) and (13) were neutral and inapplicable, respectively; and factor (14)— concerning the parents' employment schedules—favored Mother. The trial court did not weigh factor (15)—any other factors deemed relevant—in favor of either parent but reiterated that Father had been a more credible witness throughout the proceedings than Mother. Upon a detailed consideration of each factor, the trial court concluded that modifying the PPP was in the Child's best interest. We will review Mother's arguments concerning each of the relevant factors in turn.

The trial court determined that the first factor favored Father "as to both stability and strength of relationship[.]" In support, the court noted that Mother had "moved 3 times" since 2021, causing the Child "to attend 3 different schools" and that Mother was "not employed." By contrast, the court found that Father was residing "in Hixson, Tennessee with his fiancé[e] and ha[d] been employed by the same employer since 2004." The trial court stated that Mother "ha[d] a co-dependent relationship" with the Child "to the extent that she lays in bed with the 13-year-old child," as had been evinced through the testimony of the Child's counselor, Ms. Quarles, during a previous hearing. The court observed that Father had employed discipline with the Child that had not been used by Mother, and that Father had initiated counseling between himself and the Child to "better their relationship." Otherwise, the trial court determined that each parent had been "equally co-parenting since their divorce" and that both could provide for the Child's daily needs.

Mother argues that in weighing this factor in favor of Father, the trial court ignored her own marital status and the fact that she currently resides in a home with her spouse. She asserts that her marital status is more stable than Father's because Father is living with "his fiancée, her children, and her mother." Mother further asserts that there was no proof presented at trial concerning who owns the home Father shares with his fiancée. Mother propounds that even though both she and Father have seen the Child nearly every day since the PPP was first implemented, the trial court only highlighted Father's continuity in this regard. Concerning her practice of lying in bed with the Child, Mother contends that the trial court "failed to make any findings as to why laying down with the [C]hild was somehow harmful or dangerous to the [C]hild."

Upon careful review, we determine that the evidence does not preponderate against the trial court's determination as to this factor. The testimony during trial revealed that Mother and Father were both equally capable of providing for the Child's physical needs, both parents' homes were appropriate and held space for the Child, and both parents had engaged a counselor to assist the Child with his emotional needs. However, the trial court then compared Father's discipline of the Child and stable work history to Mother's and found that Father would be more capable of providing a stable environment for the Child. The trial court credited Ms. Quarles's opinion—gleaned from her testimony at the June

- 11 -

2023 hearing—that Mother had fostered a "co-dependent relationship" with the Child.[5]  By contrast, the trial court determined that Mother's testimony throughout the proceedings was "not credible."  The court also credited both Father's and Ms. Quarles's testimonies that while in Mother's care, the Child had become "addicted to video games" and additionally found that the Child's "school attendance and academics ha[d] suffered."  Based on our review of the proof presented, we will not disturb the trial court's determinations concerning credibility or proof.  *See Armbrister*, 414 S.W.3d at 693.

Factor (2) considers each parent's past and potential for future parenting responsibilities, particularly in fostering a positive relationship between the Child and the other parent.  Mother contends that the trial court "inappropriately weighed" this factor in favor of Father by focusing "solely on the pleadings and filings" initiated by Mother against Father.  Mother urges that despite her initiation of court actions to reduce Father's co-parenting time, she never denied Father his rightful co-parenting time under the existing PPP.

Concerning the pleadings and filings initiated by Mother, the trial court found:

> This matter incurred extensive litigation initiated by Mother.  First, Mother filed [a] Petition to Modify Parenting Plan on or about December 7, 2022.  Second Mother filed a Petition for Order of Protection on January 17, 2023, seeking an order of protection against Father as to the minor child, and said Petition resulted in the Court not entering an ex parte order of protection ("First Order of Protection").  Second, Mother filed a second Petition for Order of protection on or about January 20, 2023, in which she alleged Father physical[ly] abused the minor child, and an ex parte order of protection was entered ("Second Order of Protection").  The Court finds this significant, because Mother sought no contact between the minor child and Father.

> Both the First Order of Protection and Second Order of Protection were heard simultaneously on or about January 30, 2023, at which time Mother testified that Father abused the child and the child was scared of Father.  Further, Mother testified that she told the minor child about the litigation which this Court finds to not be in the best interest of the minor child.  In addition to Mother's sworn testimony, this Court heard from the minor child who was hesitant to testify.  The child testified that:  1) one time Father slapped his hand (but he was unsure when this occurred), 2) Father did not talk to him about the on-going litigation, 3) Mother told the minor child all about the on-going litigation, and 4) Father disciplines the minor child and Mother does not.  Based upon this hearing, both the First Order of Protection and Second Order of Protection were dismissed.

---

[5] The transcript from the June 1, 2023 hearing concerning Mother's motion to suspend Father's co-parenting time is not in the record.

This Court finds that Mother's testimony on or about January 30, 2023, is not credible given that the counselor, Ashley Sharp, testified that the minor child indicated to her that there has been no abuse by Father, there is no harm to the child from Father, and the minor child is not afraid of Father.

After the Order of Protection hearing and dismissal, Mother filed a *Motion for Emergency Hearing Suspending Father's Co-Parenting Time* on or about May 19, 2023. This was the third filing by Mother to suspend all contact between the minor child and Father, and the same was on the basis of alleged abuse by Father. This Motion was heard on June 1, 2023. At said hearing, the Court heard testimony from Mother, Father, and counselor for the child Lakita Quarles[.]

* * *

This Court denied Mother's *Motion for Emergency Hearing Suspending Father's Co-Parenting Time* heard on June 1, 2023, and entered a subsequent order with extensive findings on or about June 9, 2023, and the same is incorporated herein by reference. Further, the Court's finding included that Mother does not discipline the child, Mother and the minor child have a co-dependent relationship, and Mother continued to talk to the minor child about the on-going litigation. Further, the Court finds that Mother's allegations against Father are not credible, especially given the testimony of the counselor in this matter.

(Paragraph numbering omitted.)

Upon our review, we determine that the evidence preponderates in favor of the trial court's factual findings as to factor (2). The record establishes that since December 2022, Mother had initiated several actions seeking to reduce Father's co-parenting time with the Child, including two petitions for orders of protection and a motion to suspend Father's co-parenting time, all of which were denied by the trial court. Additionally, the trial court had weighed Mother's testimony concerning Father's purported "abuse" of the Child and found her testimony to be not credible. By contrast, the trial court found the testimony of the two counselors, Ms. Quarles and Ms. Sharp, concerning the Child's relationship with his Father to be credible.

Although Mother claims that she never denied Father his co-parenting time with the Child under the existing PPP, she did attempt to thwart Father's co-parenting time by initiating the aforementioned, numerous actions in court against him. *See, e.g.*, *Tankard v. Tankard*, No. M2022-00498-COA-R3-CV, 2024 WL 3964718, at *1, *4 (Tenn. Ct. App. Aug. 28, 2024) (affirming the trial court's designation of the father as primary residential parent after the court determined that the mother had thwarted the father's efforts to spend

time with his children by, *inter alia*, filing an *ex parte* temporary restraining order against him). Significantly, the trial court also considered the Child's testimony during the June 1, 2023 hearing concerning Mother's practice of speaking with the Child about the litigation between the parents, which the trial court determined to be contrary to the Child's best interest. We agree. For the above-stated reasons, we will not disturb the trial court's determination that factor (2) weighed in favor of Father.

Concerning factor (3)—refusal to attend a court-ordered parent education seminar—the trial court weighed this factor "slightly" in favor of Father because the record indicated that Father had attended a parent education seminar and had filed proof of his attendance with the trial court, whereas there was no evidence that Mother had done the same. The trial court acknowledged that there was "no proof that Mother refused to take the course." This lack of proof notwithstanding, the evidence does not preponderate against the trial court's determination as to factor (3).

Regarding factor (4)—the disposition of each parent to provide the Child with food, clothing, medical care, education and other necessary care—the trial court weighed this factor in favor of Father. The trial court contrasted Father's consistent employment—in that Father had been "gainfully employed at the same place of employment since 2004"—against Mother's lack of employment at the time of trial. The trial court also determined Father to be more supportive of the Child's school work than Mother, noting that Father would assist the Child with his homework whereas Mother would allow the Child to "miss school excessively." The trial court further determined that text messages between the parties implied that Mother was allowing the Child to stay up all night playing video games.

Mother counters that there was no proof that she could not provide for the Child's basic needs despite her lack of employment. Indeed, the proof demonstrated that Stepfather was gainfully employed and that the Child was covered under Stepfather's medical insurance. We agree with Mother that the proof demonstrated that she and Stepfather could provide financially for the Child and for the Child's medical needs. The proof demonstrated that Father was equally capable of providing for the Child's financial and medical needs. If the inquiry had ended there, both parents would likely have been found equally fit to provide such care to the Child.

However, financial and medical care are not the only types of care to be considered under factor (4). As stated above, the trial court concluded that Father was meeting the Child's educational needs better than Mother because the proof evinced that Father had been assisting the Child with his homework whereas, in Mother's care, the Child had frequently missed school. In addition, the trial court credited Ms. Quarles's testimony regarding the co-dependency between Mother and the Child. The court further determined that Mother's discussions with the Child about this litigation were not in the Child's best interest. Upon careful review, we determine that the evidence supports the trial court's determination as to factor (4).

- 14 -

The trial court considered factor (6)—concerning the love, affection, and emotional ties existing between each parent and the Child—and weighed it "slightly" in favor of Father. The court acknowledged that both parents loved the Child and that the Child was "happy" with both parents. However, the trial court compared what it deemed the parents' significantly different parenting styles to determine that "Father [was] the disciplinarian and provide[d] structure" while, by contrast, Mother had maintained a "co-dependent relationship" with the Child that the court found to be "problematic."

Mother argues that Father's disciplinary measures with the Child are "not connected with this factor" and that Ms. Quarles's testimony concerning Mother's purported co-dependency with the Child is "not a part of the record in this case." Concerning Father's disciplinary behavior toward the Child, the trial court observed that such behavior had caused "communication issues" between Father and the Child, which Father had addressed by seeking counseling for himself and the Child with Ms. Sharp. Thus, Father's discipline of the Child is relevant to determining the emotional ties and affection between Father and the Child. Regarding Ms. Quarles's testimony during the June 1, 2023 hearing, the trial court specifically incorporated its factual findings from that hearing—which included extensive findings concerning Ms. Quarles's testimony—into the final order. Therefore, the trial court did not abuse its discretion by considering Ms. Quarles's testimony from a prior hearing in rendering its decision to modify the PPP. *See Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984) ("The admissibility or exclusion of evidence rests within the sound discretion of the trial court which should be reversed only for abuse of that discretion.") (citation omitted); *see also In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted). Upon careful review, we find that the preponderance of the evidence supports the trial court's findings concerning this factor.

The trial court determined that factor (7)—concerning the emotional needs and development of the Child—weighed in favor of Father for the same reasons as did factors (4) and (6); namely, Father's attentiveness to the Child's need for "structure and discipline" juxtaposed against Mother's lack of discipline and the Child's excessive school absences. For the reasons articulated above, we agree with the trial court's findings concerning factor (7). Regarding factor (8)—the moral, physical, mental, and emotional fitness of each parent as it relates to his or her ability to parent the Child—the trial court determined that "both parents are morally and physically fit" but again referenced Ms. Quarles's opinion that Mother and the Child had a "co-dependent relationship." The trial court expressly disagreed with Mother's assertion that Father was "too strict" with the Child and instead determined that Father's parenting style provided the "structure and discipline" the Child needed. The evidence preponderates in favor of the trial court's determination concerning factor (8).

- 15 -

The trial court weighed factor (9), which addresses a child's interaction and interrelationships with other family members and their physical surroundings, school, or other significant activities, "slightly" in favor of Father. Although the trial court acknowledged that the Child maintained positive relationships with individuals in both parents' homes, the trial court noted the negative relationship between the Child and Stepfather that had led to Mother's seeking counseling with Ms. Quarles. Moreover, the trial court found that the Child had suffered from bullying at the school he had attended while residing with Mother. The trial court also found that Mother had allowed the Child to "play video games excessively" in her home whereas Father had attempted to "put limits on video game play." The evidence preponderates in favor of the trial court's findings concerning factor (9).

Concerning factor (11), the trial court reiterated that the Child had been bullied at school while living with Mother and that the Child and Mother were co-dependent. The trial court emphasized that Mother's practice of talking to the Child about the "on-going litigation" between Mother and Father was not in the Child's best interest. The evidence preponderates in favor of the trial court's determination as to factor (11). The trial court did not expressly weigh factor (15) in favor of either parent but found that Father's testimony throughout the "multiple hearings" in this matter was more credible than Mother's. The weight of the evidence preponderates in favor of and supports the trial court's conclusion that Father should be named primary residential parent and afforded a greater amount of co-parenting time.

Finally, Mother argues that the trial court failed to maximize her co-parenting time with the Child. *See Gooding v. Gooding*, 477 S.W.3d 774, 784 (Tenn. Ct. App. 2015) ("The General Assembly has established the aspirational goal for the courts to maximize each parent's participation in the life of the child[.]" (citing Tenn. Code Ann. § 36-6-106(a))). Mother posits that "a simple way to increase Mother's coparenting time would have been to increase this to 3 of every 4 weekends" and the "court could have provided Mother/Appellant every fall AND spring break to maximize her coparenting time while still leaving schooling to the Father/Appellee." However, it is not this Court's function to "tweak" the trial court's allocation of co-parenting time in hopes of reaching a more reasonable result. *See Armbrister*, 414 S.W.3d at 693. Mother further contends that the trial court was "silent on any reason, aside from the best interest factors, why equal coparenting is not in the child's best interest." Contrary to Mother's assertion, the trial court expressly applied the facts to the relevant statutory provisions and concluded that the modified PPP, which afforded Father more days annually with the Child and named Father as primary residential parent, would be in the Child's best interest. For these reasons, Mother's postulate that the trial court failed to maximize her co-parenting time is unavailing.

## V. Attorney's Fees on Appeal

Father asserts that he should be awarded the reasonable attorney's fees and costs associated with this appeal pursuant to Tennessee Code Annotated § 36-5-103(c) (West July 1, 2021, to current). This subsection provides:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

As Father asserts, the plain language of the statute indeed provides, in the court's discretion, for an award of attorney's fees to the prevailing party in matters concerning custody of children or modification of a permanent parenting plan. *See Parker v. Parker*, No. E2022-00720-COA-R3-CV, 2023 WL 6639003, at *8 (Tenn. Ct. App. Oct. 12, 2023). Upon careful review, however, we decline to award to Father his attorney's fees on appeal.

## VI. Conclusion

For the foregoing reasons, we determine that the trial court did not abuse its discretion in fashioning the modified permanent parenting plan by naming Father the primary residential parent and granting to Father more co-parenting time than to Mother. We therefore affirm the trial court's judgment in all respects. We decline to grant Father's request for an award of attorney's fees on appeal. This case is remanded to the trial court for enforcement of the judgment and for such further proceedings as may be necessary. Costs on appeal are taxed to the appellant, Velena Maria Ramirez Stierle.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE

- 17 -